Case No. 204303 Harry Calcutt v FDIC Argument not to exceed 15 minutes per side Good morning. Good morning. Thank you and may it please the Court. Sarah Harris for Petitioner Harry Calcutt. And I would like to reserve three minutes for rebuttal. Very well. This Court should vacate the FDIC's order and there are many paths to do so. First, the FDIC's ALJs and Board are unconstitutionally insulated from removal. Second, the agency failed to remedy an earlier Appointments Clause violation. And third are the... Failed to remedy... An earlier Appointments Clause violation. And third are the multiple APA violations. But perhaps the simplest path would be to hold that the ALJ here violated the APA by refusing to let Mr. Calcutt cross-examine three key adverse witnesses whose testimony the Board relied on 40 times and used for key findings including things such as concealment and willfulness. When remanding, this Court should also remedy the unconstitutional ALJ tenure protections here. Otherwise, a remand would simply inflict further constitutional injury upon Mr. Calcutt the minute... Can I ask you about the constitutional challenges? I know both parties have essentially agreed that there is for-cause protections to the FDIC. But when I looked at the statute, it just said a six-year term. That six-year term dates to actually in between Myers and Humphrey's executor. So Congress was presumably acting under the understanding that Myers was law. And then we have Collins most recently suggesting unless there's an unambiguous for-cause protection, we should assume that there is at-will employment. So why... If we just interpret the statute to be at-will employment, why wouldn't that avoid any constitutional questions in this case? Sure. So with respect to the ALJ tenure protections, I think that you would still have at least four probably levels of tenure protections. And let me sort of go through those levels if I may. The first is that the ALJ themselves are protected through for-cause removal under the statute 5 U.S.C. 7521. And then it's not the FDIC board or even the four agencies that collectively employ those ALJs who decide whether there's cause for removal. So the second layer is actually the Merit Systems Protection Board, which is an independent agency that is itself insulated from tenure protections under the APA. So that's the second level. The third through fifth levels include the FDIC. So it's four agencies collectively that have to all sign off on a removal decision to initiate the process. And so even if you thought that the FDIC is not tenure protected, there is still the Federal Reserve as part of that process, which has a statutory for-cause removal protection. So I think I get at least to three levels of tenure protection. I think you could question whether the NCUA is also an agency with tenure protections. It's also term limited. So I think even accepting the premise that the FDIC simply doesn't have tenure protections, a premise that I think the parties dispute, you would still have a serious constitutional problem because three levels of tenure protection vastly exceed what the Supreme Court said in free enterprise is essential for the executive branch to be able to, for the president specifically, to be able to hold inferior officers in the executive branch to account. And I think this is not a surprising problem. I mean, the government as early as 2017 has flagged that this particular structure for ALJs, insofar as ALJs are officers, which is an issue the Supreme Court has since resolved, does indeed pose serious constitutional problems. And so it's been a sort of latent problem in these cases for quite a time that has, I think, created a cloud for a lot of ALJ proceedings. And so if this court is going to remand the proceedings back to the ALJ, which we think is the minimum required here, the court should at least avoid the constitutional problem of having Mr. Calcutt again before an adjudicator who is not constitutionally accountable in the executive branch. That's when the constitutional harm occurs. And how would we solve that? That is, we issue an order that restructures all of these boards? No, I think you could actually do a couple of fairly narrow, tailored rulings that are really specific to this extremely unique structure. So let me just give you three options. And I think the touchstone here is really what the court has said in Arthrex and other cases, that you're sort of trying to do a targeted surgical effects to the unconstitutional problems. So I think your first option would be to say two things. First of all is that Section 7521, which is the provision that gives the MSPB power to decide whether cause exists, should be severed so that it would be the four agencies, the banking agencies that actually employ these ALJs, who would be making that decision. And I don't think that's a radical fix, is what Judge Rao proposed in her dissent in the Fleming case. She was the only judge to reach the tenure protection issue there. And the second thing that I think the court could do, although it would really depend on whether the court thinks that the FDIC had tenure protections at all, if the court thinks that the FDIC has no tenure protection, then that's all you need to do. Because at that point, I think the one thing you would have to do is sever the joint decision-making from FIREA, which is the act that requires sort of unitary decision-making by all four agencies, such that any one of the agencies could initiate removal. Would you agree? I'm hesitant to reach the statutory question, but usually we have avoidance concerns. So would you say that the statutory question about whether the FDIC does have four-cause protections is embedded within the underlying constitutional questions about whether those four-cause protections are unconstitutional? I mean, I know the parties haven't briefed it, but it seems kind of embedded in the constitutional question. I don't think you'd actually necessarily have to reach it, because even if you assumed arguendo that the FDIC did or didn't have tenure protections, because the Office of the Comptroller of the Currency absolutely is at will removable, under the fix I'm proposing now, as long as any one of the four agencies could initiate the removal proceeding, we know that the Comptroller, under any interpretation, can certainly do so, and so would be responsive to the President. And so I don't think to resolve the ALJ tenure protection issue, you would even have to decide, if you're not comfortable deciding, whether the FDIC is in fact tenure protected. It's because, again, I think the extremely unusual structure of the ALJs here and the multiple overlapping agency decision-making that was, in 1989, imposed on these agencies under FIREA, is sort of what sort of creates an extra, I think, extra degree of unconstitutionality under the precedents, and actually helps, I think, in the fix in some ways. And what about Collins and the remedy there? I mean, Collins says what we should be thinking about is, for-cause removal protections do not inherently make unlawful executive action. And so here the executive action is in order under 1818E and the penalty provisions. So why does the fact that the ALJ had removal protections render that order unlawful? Sure. So a few responses. First is that if you accept the premise that the cross-examination or really any other error in this case requires vacater and a remand, essentially, to the ALJ, I don't even think you have to deal with the Collins problem because you've already vacated the order. And so the reason to deal with the ALJ tenure protection is there is to avoid prospective injury of, again, having to proceed before an unconstitutionally structured proceeding. But I think even if you wanted to look at the ALJ question in isolation, Collins is a case that I think very carefully confines its discussion of remedies to retrospective agency action. The issue there was that there is an acting director of the FHFA, and there is also a confirmed director for various points, but the agency had rescinded the challenged agency action. So it was really sort of a narrow window of time in the past in which there might be compensation for the agency's action. And Collins said when you're thinking about a retrospective agency action, then yes, you should look to whether there is, I think the court put it as, a reasonable possibility or a risk of prejudice to the party. And here we're talking about a prospective order. It's essentially... Do you concede that Calcutt has not alleged prejudice in this case? I do not concede that. Where is the allegation of prejudice and what is it? Sure. So the allegation of prejudice is similar to the one in Collins, actually, that the court said was sufficient for a remand, which is that there is a real risk and uncertainty that a constitutionally structured agency would have made different decisions. And I think we've pointed to a couple of things here that are particularly important, one of which is that a more responsive ALJ or board would have been far more likely to heed the advice... That just sounds speculative to me. The advice of whom? I'm sorry. The advice of the Solicitor General's Office and heed the practice of other agencies after Lucia when confronted with the appointments clause violation. Those agencies did indeed give a fresh start in de novo review, whereas the FDIC did not do that here. I think the other questions, and again, very similar to Collins, is that accountable executive branch officers are more likely to make decisions more in line with the administration policies. Did you have any specific allegation that the completely start over ALJ would have ruled any different on either your bias issue or some other issues than the ALJ did here in the proceedings, where he gave some opportunity for do-overs? And otherwise, he made a procedural ruling, which any ALJ... So I didn't see a theory whereby the completely new ALJ would have done anything any differently. So I think that a couple of responses. First of all, I think that the mere possibility that a different decision maker would reach a different decision because of the accountability is what the Supreme Court seemed to accept in Collins as sufficient for a remand. And second of all, I think that would at least warrant some opportunity to develop that. But second of all, again, I don't think you even need to reach tricky questions about Collins and remedies if you agree that there is any other basis in which to vacate the board's order. Because at that point, again, all I think you would have to do is to say that the board's order is invalid, that there is a remand on some basis, and the question really is sort of prospective as to whether you will avoid inflicting additional constitutional injury going forward by having... And assuming that we did remand on any basis, what is your position on what happens then? You have to have a completely new ALJ, completely new hearing. Do you do anything to the FDIC or these other boards under your position? So I think it depends on exactly which ground you have. I think part of that is simply because some of the remands could return to the board, some of the remands could return to the ALJ. Obviously, I think our preferred position is one in which the ALJ is correcting errors that happened at the ALJ stage. And so with respect to, for instance, the cross-examination issue, I think the ALJ would in fact have to have a new hearing in which there is an opportunity for cross-examination of these adverse witnesses for approximate causation, for instance, given the lack of any findings of really any nexus between what the order charged Mr. Calcutt with, including a $6.4 million loss and his misconduct. I think there would also have to be new proceedings in that sense, and a similar issue going back to the ALJ for the Lucia problem. There are other issues where it may be possible to simply remand to the board. Regarding causation and the harm or perspective harm to the bank due to Calcutt's alleged misconduct by his unsafe, unsound banking practices, why isn't the $30,000 write-off of the Bedrock loan clearly an approximate cause of the alleged misconduct? Sure, a few responses to that. First of all, the $30,000 write-off is something in which the FDIC required the loan to be written off. It is signifying that the amount is unlikely to be collected, but not certain to be. Doesn't that cause harm to the bank? Sure. So I think the question is whether it is sufficiently likely to be harm to the bank. So we're challenging whether it qualifies or really isn't. Why isn't it? Is it just the amount? Why doesn't a $30,000 write-off likely cause harm to the bank? Sure, and the reason is because a $30,000 amount relative to the amount of the loan in the context of this sort of collection proceeding is not sufficiently probable given that there can be ensuing collection efforts. But I just would also point out that is one of four different effects that are found, and I think the most serious fault in the proximate causation analysis, and again, there would be a remand if any single one of these falls apart. Why is there a remand? So suppose we agree with you on two, but disagreed with you on the $30,000 one. Why can't we affirm on that basis rather than remanding on the other basis? Sure, and I think you would be creating a circlet split if you took that approach, and the reason is that the FDIC's analysis of whether the draconian penalty of kicking someone out of the banking industry for life is warranted is a cumulative look at all of the harms in the case. And so the idea that you would, for instance, say that a $30,000 loss to the bank is sufficient while disregarding the fact that the Isn't the standard abuse of discretion, and we would consider all the facts and the extent of the misconduct here? I mean, we look at the amount of damage to the bank, but we also look at the culpability of Calcutt and his unsound and really outrageous banking practices here. Don't we balance them all together to determine whether the FDIC abused its discretion in imposing this sanction? Well, respectfully, Judge Griffin, I think that would be very seriously at odds with APA review as employed by other circuits. And so, for instance, the De La Fuente case and Seidman are two examples from other circuits in which the courts said that there was an error with respect to at least parts of the analysis that the board undertook, but not with respect to others. And it's really up to the board in the first instance to figure out if they would impose the same penalty despite missing some of the criteria. Again, that is because the penalties really are cumulative. And so when the agency itself is not weighing those factors in the first instance, it does seem like it is inconsistent with what the APA is requiring when reviewing agency action. And again, even if you disagreed with me on some of the statutory misconduct grounds, we still think the cross-examination argument, in particular, would certainly be sufficient to necessitate a remit in the first instance. You'll have your three minutes rebuttal. Any further questions at this point? Thank you. Thank you, Ms. Harrison. All right, let's hear from the respondent. Good morning. Good morning. May it please the Court. Michelle Ognebeni on behalf of Respondent FDIC. I'd like to address first the FDIC board issue. Judge Murphy, you were asking some questions about that. The FDIC does not think that the Court needs to reach that issue because it was not exhausted before the agency. Doesn't it flip the canon of constitutional avoidance? You mean the entire issue or just the statutory issue? The entire issue. Because I think the statute – would you agree that the statutory issue is embedded in the constitutional question? Because the constitutional question asks whether four-cause removal protections are constitutional. And then if the statutory question is there's no four-cause removal protections, it would seem like an advisory opinion to me if we reached a constitutional question that had no basis in the statute. Yeah, and that's – you know, those issues are reasons why we think the Court shouldn't hesitate to apply its exhaustion precedent and determine that this issue has not been presented properly and should not be considered. On just exhaustion more generically, what do you make of the FDIC opinion in the reply brief that suggested that when the FDIC is presented with constitutional arguments, the FDIC has said in its opinions that it has no jurisdiction over those arguments? There was that one opinion that they cited where that was said. That is not the FDIC's general position. We address constitutional issues, due process concerns, that nature that are raised properly all the time. Do you have examples of that, like case citations or FDIC opinion citations? I don't offhand. I advised on some of those opinions. I'm familiar with them. But we could submit them as supplemental authority if the Court would like after the hearing. But I think that that particular case that they cited, it was described in terms of jurisdiction, but it was really an abstention type of decision. They said this was preserved, and so we're going to note that it's preserved. And then once this is decided, if they would like to petition for review, the federal court would have the authority to enter the relief they're seeking. Here I think it's a little bit different, because had the issue been presented, it's possible that Calcutt could have received the relief he's seeking. He's not asserting a facial challenge here. It's an as-applied challenge. And so it's possible if the FDIC board agreed with his argument that it might have declined to enter the prohibition order, maybe the one member of the board who has purported removal protection right now would have recused herself. It's impossible to know what things the board might have considered, but this futility idea doesn't seem to really apply in this context. I think this type of argument... So I've looked at the regulation. So the way I view exhaustion, there's like statutory exhaustion. That doesn't seem to apply here. And then there's regulatory exhaustion, which there is a regulation, and I looked at it. But the regulations seem to be you need to exhaust with the board issues or problems with the ALJ decision. And this type of argument is a little different, because the argument is not challenging the ALJ decision. It's just challenging the makeup of the board. Does that type of argument fit within the regulation? I believe it does fit within the regulation. The regulation encompasses challenges to the proposed order that the ALJ proposes to the board. And this would be a challenge to the proposed order, essentially a challenge saying this proposed order is unauthorized. The FDIC board should not enter it because it's unconstitutionally structured. So it seems to fit within the very broad regulation. It's definition of what constitutes exceptions that need to be exhausted. What would you do with cases like Carvey, Saul, and others, Jones, Brothers, that suggests structural constitutional challenges simply don't need to be exhausted? Well, Jones, Brothers was unique to the statute in that case. It was not holding that you should never enforce statutory or regulatory exhaustion requirements when these sorts of structural issues are raised. It was saying that within the context of that case, there was an exception within the statute that permitted an exception to the exhaustion requirement. It was an extraordinary circumstances language in the statute that the court was relying on. If you look at Joseph Forrester and Island Creek, those are both situations where there was no indication of grounds for an exception within the exhaustion requirement being considered. And those courts had no problem with finding that a challenge to an ALJ appointment had to be exhausted. Also, Carvey versus Saul, I think it's just a very different case from this one. It was addressing judge-made exhaustion requirements, not regulatory or statutory exhaustion requirements. And it restricted its analysis to non-adversarial settings. This is unquestionably an adversarial proceeding. So it just doesn't really seem to apply to these circumstances. Well, switching to other merits, Saliha Law does seem to quite narrowly cabin Humphrey's executor and basically cabin it to its facts. How would you respond to the notion that Humphrey's executor may not even be good law anymore with respect to the FTC because the FTC's duties have changed and Saliha Law suggested that it is only limited to essentially an investigative body that has no coercive power. And the FDIC clearly has coercive power. It issued this $125,000 fine. Well, I'd point out that both Saliha Law and the recent Collins decision both took pains to say that multi-member headed agencies are different. I'd point to Collins in particular. I believe it's footnote 19. They discussed the sinking fund commission, which was a commission headed by multiple members. And there, some of those were removable at will. Some were not. And so that's sort of the situation that we're presented with here. This isn't really on all fours with Humphrey's executor. That's why we haven't really argued that Humphrey's executor is controlling in this case because the FDIC board is different from the FTC. Not all of our members have any sort of removal protection. It's not even alleged that they do. Unquestionably, two of the members that are authorized by the statute are now removable at will. We currently only have one member still serving a fixed term, which is the basis for asserting any removal protection for any of the members. And so the premise that Mr. Calcutt's argument is based on, that a majority of our members are protected from removal, just isn't true and hasn't been true at any time when this decision was being considered. What do you make of the ALJs? They're clearly protected. I had thought the double layer issue had gone from the FDIC to the ALJs, but if it goes from the ALJs to the distinct administrative body that actually appoints the ALJs, is that still like free enterprise fund? I think it is still like free enterprise fund. I'd like to point out a couple of things. First, the OFIA structure, it does make it seem confusing, but it doesn't present separation of powers concerns because the requirement for joint decision making, it only appears in an MOU among the agencies. This ALJ is an employee of the FDIC administratively. That's how it's accomplished. And so there is this MOU saying that the agencies should confer and need to agree on changes in personnel, but that's an MOU. It's not a requirement imposed by Congress. So there's no separation of powers issue there that needs to be resolved by this court. If the court decides that no, that makes things too complicated, then the agencies just don't have to do it. The FDIC is technically the employer of the ALJ. It can act in any way it sees fit to initiate removal proceedings if it wanted to. And so I think that those layers from the OFIA structure kind of don't really amount to much. Second, I think that there was a recent decision that came out after briefing in this case in Decker Cole from the Ninth Circuit that addressed specifically the issue of whether 5 U.S.C. 7521 presents an issue, and they said it didn't. And they emphasized a lot of the arguments that the FDIC raises. The adjudicatory functions that ALJs are performing make them different. They rely on that free enterprise carve-out in the footnote where the court said that they weren't addressing ALJs of independent agencies because there's some question of whether the same concerns arise. They don't wield executive power in the same way that other executive officers might. And we think that's definitely true if you look at our ALJs. They don't wield executive power. They don't have any authority to authoritatively interpret statutes. They just issue recommendations. The board decides the interpretation. Who is the fact finder? The board is. The board basically issues its own independent decision. The ALJ is a hearing officer, essentially. The board doesn't hear the witnesses, though. So usually you think of a fact finder as the key point about the fact finder is the fact finder sees the credibility of the witness before them. So how does that affect the FDIC's fact finding function? Well, they receive the recommended decision and they make their own determinations. The ALJ does make some credibility determinations, I suppose, in making his recommendations. But none of his fact finding has any binding force on the board. It can reach its own conclusions. And so because of this recommendation function, this limitation on the ALJ's powers, this seems to squarely fit within what the court was thinking about in Free Enterprise Fund when it said ALJs could be different. And it comports with the reasoning of the Ninth Circuit in the Stecker-Cole decision, which we'd be happy to submit as supplemental authority. Speaking of credibility and bias of witnesses, can you address the argument of Calcutt that there was improper limits on the cross-examination of these witnesses and it caused him harm? Sure. I think that what Mr. Calcutt is complaining about is that he wasn't allowed to pursue the sequencing of examination that he would prefer. The ALJ said, you know, you have to bring this up in your case in chief. And the ALJ, when it was addressing his objection... It was an internal rule? ...just in managing the hearing. And the ALJ, though, did say, like, I anticipate that this will come up again. Sort of inviting Mr. Calcutt's counsel to, you know, seek relief to amend their witness list or do something to try to get the evidence in, but they never did anything. And it's unclear why. And second, he just doesn't connect these things to any real harm. He doesn't show how it matters. He doesn't dispute most of the things that the board relied on these witnesses for, those facts. Most of the facts are supported by ample other evidence in the record. He argues that he's unable to cross-examine them as to their bias and prejudice and that therefore goes to their credibility. What's wrong with that argument? Well, at first, he was able to cross-examine them extensively. So the ALJ would have been able to assess all the things that normally go into credibility, their demeanor, what their responses are, any inconsistencies in their testimony. Like, that unquestionably happened. What he's complaining about is that he wasn't able to specifically probe the sequence of events where, you know, the bank's borrower was essentially communicating with the FDIC's examiner and certain things that they said about him. But none of these witnesses were presented as impartial. The ALJ would have known that. He knew that, you know, Corey Nielsen had an ax to grind with him. There was ample indication of that. He knew that the FDIC's examiner works for the FDIC. There's always some bias there, presumably. So they weren't presented as impartial experts or anything like that. And so the fact that this particular line of questioning would have made a difference, Mr. Calcutt needs to explain why, and he just hasn't done that. And so going on from that, there was some discussion of the, I don't know if there were any other questions on those issues, but there was some discussion of the 1818E findings in particular. Your view of the statute. The hypothetical, imagine a billion-dollar bank. An officer gives a thousand-dollar loan to somebody who's down on his or her luck. And it's really not a very good loan. The officer thinks, oh, we'll give this person a break. And would fall outside banking practices. Would that, if the $1,000 loan had an effect on the bank, because even if it's de minimis it would satisfy that, it would be an unsound practice, I assume, under your view, if it was just a kind of a bad loan. Would that be enough to ban the officer from the banking industry for this kind of de minimis injury? I think I'd first point out that we don't generally ban people from banking just because they've made bad loans. There's an examination of the types of misconduct that are engaged in. Are these things that are, you know, present serious risks if they were to continue on into the future? And that's sort of the analysis that was followed here. We're not punishing Mr. Calcutt because he made some bad loans. We're prohibiting him because he engaged in things, you know, failing to determine whether the borrower had an ability to repay, lying to the board, lying to regulators. We're punishing those types of misconduct rather than, you know, looking at whether it meets a certain threshold of amount of loss. So the way I read unsafe, unsound practice, you could emphasize the practice word. Like, I don't think you'd say somebody is in the practice of engaging in risky loans if all you have is evidence of one bad loan. So why wouldn't that standard apply here? Since I think this really comes down to the bedrock transaction. That's essentially one loan. Doesn't an unsafe, unsound practice kind of, like, talk about a habit or a custom of making bad loans? I'd say that's generally how we choose to exercise our enforcement authority. Then why is that factor satisfied here, if it was just the one bedrock transaction?  That's not what the FDIC held, however. It held a range of activities were improper. They were all associated with this one loan, right? Lying was about the loan. Insufficient due diligence was about the loan. So is it all those practices with respect to this one loan can still? No. There were also practices related to renewals of the other loans that were coming due. There were findings of that nature. And also his failure to accurately report earnings on the call reports, those related to kind of the whole lending relationship, not just this one loan. He was also hiding the relationship of the various Nielsen entities, that they had various entities, and he instructed them not to disclose the finances. You know what I'm talking about. Yes, yes, yes. There was advice to them about how to disguise these kind of intercompany transfers. Yes, and that was noted in the decision. It wasn't more than the bedrock loan. Yes. There were things about the whole lending relationship that the board made findings about. It wasn't just this loan. They focus on this one loan or this one transaction in their brief, but it's important to note that the board decision was broader than that. Okay. You're out of time, but I'll give you another 30 seconds if you want to wrap it up. So I guess unless there are further questions, we would ask that the court deny the petition for review. Any further questions? Judge Box? No. All right. Thank you very much. All right. Three minutes to bottle. Thank you. I'd like to make three points, really addressing some new arguments that FDIC counsel has just proposed. The first of which I'd like to cover is cross-examination. I take it FDIC counsel is now saying that the ALJ said we were on notice of this novel cross-examination requirement because he said at some point that the issue would come up again. That's not in their briefs, and really, just to be very clear about what happened here, the ALJ initially announced a rule that was confined to direct examination. It did not say if you want to cross-examine someone about the scope of things that are beyond direct, you have to notify them on direct. That only came up midway through the hearing when Mr. Calcutt tried to cross-examine Autumn Burden with respect to questions of her bias and also the bias of Corey Nielsen and Ann Meissner, who are critical witnesses. So the idea that Mr. Calcutt had some sort of opportunity to cross-examine these witnesses about their bias just doesn't hold. You can look at 8231. I think it's a pretty good example of what happened, which is when Mr. Calcutt tried to introduce this testimony, the ALJ, this is a second objection, said, end of dialogue, next question. I don't think at that point there was anything that could have been done, and I also don't think there's any question about the seriousness of this testimony. Judge Griffin, you mentioned actually a couple of findings that really rest on these witnesses' credibility and testimony with respect to Mr. Calcutt's motivations for the loans, the things that he recommended doing, whether he was concerned with regulatory red flags. Again, Examiner Meissner was also the person who put the examination into play. It is extremely unusual for an FDIC examiner to be communicating with state regulators to give a break to a non-performing borrower, which is what happened in some of this correspondence. Establishing the foundations of this examination as questionable would not have just gone to the 40 times the Board is relying on this testimony, but also Ms. Meissner's credibility as an expert, she was an expert witness here, as well as key findings with respect to concealment and other issues. Now, quickly on some other issues and new arguments, specifically on the ALJ tenure protection issues. This is the first we're hearing that the OFIA Memorandum of Understanding is the only basis for this joint structure. I don't think that's a plausible reading of the statute, Frirea, which is at 12 U.S.C. 1818 note. It charges these four agencies with jointly acting with respect to ALJs. That's in the statute. It's a joint pool. It does certainly seem like the agencies have been proceeding on that understanding because it's the interpretation of the statute. Third, Decker-Cole, I do think it's a little much to introduce a new case in just an argument instead of doing it in a 28-J letter. But I would note with respect to that case, that case is about the Department of Labor ALJs whom that agency does not have to use. There's actually an express statute, 30 U.S.C. 932A, that expressly relieves the Department of Labor of having to use ALJs with tenure protections. That really was fundamental to the holding in that case and why Decker described the case as limited to the facts of that case. So we think there are, again, many paths to a vacater in this case and that under cases like De La Fuente and Seidman from other circuits, if there is some basis on which the board's order cannot be sustained, the board in the first instance really does need to be the one to revisit, whether it would impose the really harsh penalties that are issued here. And so we would ask the court to vacate. All right. Any further questions? All right. Thank you, counsel. Thank you for your argument. The case will be submitted. We may call the next case.